COX, Circuit Judge:
Gustavo Dominguez, a professional sports agent, was convicted of smuggling five Cuban baseball players into the United States, transporting the players from Miami to Los Angeles, and harboring them there until they applied for asylum. See 8 U.S.C. § 1324(a)(2), (a)(l)(A)(ii), and (a)(l)(A)(iii) (criminalizing the bringing in, transporting, and harboring of unauthorized aliens). The theory of prosecution was that Dominguez, and several codefendants not parties to this appeal, conspired to bring, unsuccessfully attempted to bring, and then successfully brought five Cuban baseball players to the United States so that the players could pursue professional baseball careers. And, the prosecution’s theory was that Dominguez had a role in transporting and harboring the players after their arrival in the United States. Dominguez anticipated that, after the players arrived, he would represent them as their agent, negotiate any potential baseball contract, and collect a percentage of their earnings as a fee. The indictment alleged, and the jury found, that Dominguez smuggled the players for the purpose of commercial advantage or private financial gain. Based on this finding, the district court imposed a five-year mandatory minimum sentence under 8 U.S.C. § 1324(a)(2)(B)®.
Dominguez now appeals, challenging his convictions and sentences on various grounds. He argues, among other things, that the evidence did not support any of his convictions.
We conclude that the evidence does not support Dominguez’s convictions of transporting and harboring aliens (Counts 44 through 53). We reverse these convictions and vacate their sentences. We conclude the evidence supports Dominguez’s convictions of conspiracy to smuggle, aiding and abetting an attempted smuggle, and aiding and abetting a smuggle (Counts 1, 5, 6, 10, 13, 19, 28, 29, 33, 35, 40). We affirm these convictions and sentences. We find Dominguez’s other assertions of error to be without merit.
I. BACKGROUND & PROCEDURAL HISTORY
A. Facts
Gustavo Dominguez is a native of Cuba and a naturalized United States citizen.[1] He works as a sports agent, and through his company, Total Sports International (“TSI”), he has represented over 100 baseball players, many of whom played for Major League baseball teams. Some of these baseball players were Cuban nationals who came to the United States without official documents authorizing their presence in the United States. This criminal case involves Dominguez’s role in helping five Cuban nationals come to the United States in order to pursue professional baseball careers.
*1057 The smuggling venture at issue in this case began with Dominguez’s relationship with Ysbel Medina-Santos (“Medina”). Medina has lived a life of crime; he has numerous prior convictions for drug trafficking, smuggling, insurance fraud, and money laundering. When he faced a lengthy prison sentence for drug smuggling, he agreed, in exchange for a potentially reduced sentence, to testify against Dominguez about his role in the smuggling of these Cuban baseball players.
According to Medina, he and Dominguez agreed in November 2003 to smuggle two Cuban players, Yuniesky Betancourt and Saydel Beltran, to the United States.[2] In exchange for Medina’s assistance in smuggling the players into the United States, Dominguez promised that the players would pay Medina 5% of any Major League baseball contract that they might sign. Dominguez anticipated that he would represent the players as their agent, negotiate any potential baseball contract, and collect a percentage of their earnings as a fee. The smuggle was successful and, with the help of Dominguez’s representation, Betancourt signed a Major League contract for $2.8 million with the Seattle Mariners. Medina then asked Dominguez for 5% of the contract ($140,000). After Betancourt failed to pay the $140,000, Medina held Dominguez responsible for the money.
In July 2004, about eight months after the Betancourt-Beltran smuggle, Dominguez contacted Medina about smuggling more Cuban players into the United States. Dominguez and Medina agreed to bring five Cuban players to the United States: Francisely Bueno-Trueba, Osbek Castillo-Perez, Allen Guevara-Perez, Os-many Masso-Arredondo, and Yoankis Turino-Montalno. Medina told Dominguez, however, that he would not attempt to bring these players to the United States until he was paid at least $100,000 of the $140,000 that he was still owed for the Betancourt-Beltran smuggle. Dominguez then made two $50,000 transfers from an account he managed for another athlete client and wired the money to Medina, without the client’s knowledge.
After Medina received the $100,000, he agreed to smuggle these five Cuban players. One of Medina’s contacts called the players in Cuba, asked if they wanted to leave, and told them when and where they should meet the “fast boat.” Medina hired Geoffrey Rodrigues to drive the fast boat from Cuba to the United States.[3]
This July 2004 smuggling attempt failed. The United States Coast Guard intercepted the fast boat about ten miles south of Key West, Florida. When Rodrigues attempted to flee, the Coast Guard shot the engine of the boat to get it to stop. The five players were detained and returned to Cuba.
After the first attempt failed, Dominguez asked Medina about a follow-up smuggle. Medina agreed to the follow-up. Because Rodrigues had been caught, Medina hired Roberto Yosvany Hernandez to bring the players to the United States in exchange for $100,000.[4] The smuggle was *1058 successful. The five players, along with over a dozen other Cubans, were dropped off in the water off Deer Key, Florida on August 22, 2004, around 5:00 a.m. All five players testified that they had no papers authorizing their entry into the United States when they arrived.
In exchange for smuggling the five players into the United States, Medina wanted $150,000. Dominguez had no problem sending the money, but he warned Medina not to continue using his same bank account and instead to have the money directed into a friend’s account. After the players arrived on August 22, 2004, and continuing into September 2004, Dominguez transferred $125,000 into the accounts of two of Medina’s friends, his father, and his sister. These individuals then paid Medina. Dominguez still owed Medina $25,000.
After the players arrived in the Florida Keys, Medina brought them to the Miami home of Andy Morales, who is a former Major League player and former Dominguez client. The players were given clothes, food, and shelter. Medina informed Dominguez that the players had arrived, and Dominguez asked Medina to drive the players to Los Angles with Ramon Batista.[5] Medina, Batista, and the players left Miami on August 23 and arrived in Los Angeles on August 26.
When the players arrived in Los Angeles, Dominguez met them at a restaurant. He told them about his past successful representation of Cuban baseball players and that he could represent the players in similar fashion. All five players signed agency contracts with TSI. In addition to the contracts that the players signed with TSI, Dominguez had the players sign contracts obligating them to pay Medina a percentage of their baseball earnings. Dominguez and Medina intended for this arrangement to pay off the $25,000 balance that Dominguez owed Medina for the smuggle.
Shortly after the players arrived in Los Angeles, Dominguez arranged for Humberto Gray, an experienced immigration attorney who has done immigration work for TSI since the late 1990s, to process the players through immigration. By October, Gray had interviewed the players and was doing whatever was necessary to process them, including having them undergo examinations by physicians approved by United States Citizenship and Immigration Services (USCIS). Gray told Dominguez that he had set up an “initial appointment” for the players at the USCIS Los Angeles office sometime toward the end of October. Gray had the appointment changed to November because Dominguez had a conflict and would be unable to accompany the players to the USCIS office in October.
Meanwhile, TSI had the five players housed in an apartment complex. Every weekday, and on some Saturdays, they trained and played games at the Pierce College baseball facility in Woodland Hills. They were free to come and go as they pleased. They went out with friends, to restaurants, and to watch professional baseball games. The players were also featured in a documentary film that sought to portray the progression of Cuban baseball players in the United States. On November 12, TSI had the players tryout in front of scouts from almost all of the Ma *1059 jor League clubs. The tryout was successful, as three of the five players signed Minor League contracts.
On November 19, Gray and Dominguez accompanied the five Cubans to the US-CIS to apply for asylum and parole. They were paroled. Gray thereafter represented them before the USCIS. Turino and Guevara stayed in the United States. Bueno, Castillo, and Masso went to the Dominican Republic; Dominguez had arranged for them to play baseball in the Dominican Republic where they could be showcased before Major League scouts.
Dominguez testified at trial. “Dominguez’s defense was based on testimony he was unaware the players were smuggled from Cuba and only found out they were in Miami after their arrival.” (Appellant’s Brief at 55.) He denied having entered into an agreement with Medina to have them brought from Cuba to the United States.
B. Procedural History
1. The Indictment
In October 2006, a Southern District of Florida grand jury returned a fifty-three count indictment against Dominguez and others who are not parties to this appeal. The Government dismissed most of these counts prior to trial. Dominguez proceeded to trial on twenty-one counts: Count 1 charges Dominguez with conspiring to bring aliens to the United States, transport aliens within the United States, and conceal, harbor, and shield aliens within the United States, all for the purpose of commercial advantage or private financial gain, in violation of 8 U.S.C. § 1324(a)(2) and (a)(2)(B)(ii), 8 U.S.C. § 1324(a)(l)(A)(ii) and (a)(1)(B)®, 8 U.S.C. § 1324(a)(l)(A)(iii) and (a)(1)(B)®, and 18 U.S.C. § 371. Counts 5, 6, 10, 13, and 19 charge Dominguez with aiding and abetting the attempt to bring in aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. Counts 28, 29, 33, 35, and 40 charge Dominguez with aiding and abetting the bringing of aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. Counts 44 through 48 charge Dominguez with transporting aliens within the United States, in violation of 8 U.S.C. § 1324(a)(l)(A)(ii) and (a)(l)(B)(ii). And Counts 49 through 53 charge Dominguez with concealing, harboring, and shielding aliens from detection, in violation of 8 U.S.C. § 1324(a)(l)(A)(iii) and (a)(l)(B)(ii). Dominguez pled not guilty to all counts.
For the sake of clarity and brevity, our opinion groups Dominguez’s convictions into three categories based on the nature of the charges. We refer to his convictions of conspiracy to smuggle (Count 1), the attempt to smuggle, (Counts 5, 6, 10, 13, 19), and smuggling (Counts 28, 29, 33, 35, 40) as the smuggling convictions. We refer to his convictions of transporting aliens (Counts 44 through 48) as the transporting convictions. And, we refer to his convictions of concealing, harboring, and shielding aliens from detection (Counts 49 through 53) as the harboring convictions.
2. Motion in Limine
Prior to trial, the Government filed a motion in limine seeking to preclude Dominguez from referring to “Legislative and Executive Branch immigration policies” that apply specifically to Cubans — namely, the Cuban Adjustment Act (“CAA”), 8 U.S.C. § 1255, and the “Wet-Foot/Dry-Foot” policy. In response, Dominguez’s counsel argued that Dominguez reasonably believed the CAA and the Wet-Foot/Dry-Foot policy gave the Cuban players eligi *1060 bility to remain in the United States. See Appellant’s Brief at 23 (“[Dominguez] understood [the players’] arrival to and presence in the U.S. was lawful.”); id. at 35 (“The jury should have considered whether it was reasonable for the defendant to believe the Cubans were not illegally in the U.S.....”); R. 1-176-1 at 9 (“[A] Cuban national who arrives on dry land is eligible to remain in the United States, because that Cuban national’s status in the United States is not in violation of the law.”). He thus contended that the CAA and the Wet-Foot/Dry-Foot policy were relevant to the issue of intent to violate the law. The district court rejected this argument and granted the Government’s motion in limine. The court found that Dominguez’s beliefs about the CAA and the Wet-Foot/ Dry-Foot policy were irrelevant to his intent to commit the charged offenses. The court therefore prohibited Dominguez from making any argument regarding the CAA and the Wet-Foot/Dry-Foot policy at trial.
3. Motion for Judgment of Acquittal
After the Government’s case-in-chief, Dominguez moved the district court for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a). He argued, among other things, that the Government had not established that he knew the five Cuban players had not received “prior official authorization”; that he transported the Cubans “in furtherance” of their illegal status; or that he concealed, harbored, and shielded them to avoid detection. The court denied the motion. Dominguez renewed the motion at the close of all the evidence. That motion was denied as well.
4. Sentencing
After a seven-day trial, the jury convicted Dominguez on all twenty-one counts. The court sentenced Dominguez to a five-year mandatory minimum term for each of the'twenty-one counts of conviction, with each term to be served concurrently. Dominguez received the five-year mandatory minimum under 8 U.S.C. § 1324(a)(2)(B)(ii) because he was convicted of smuggling three or more aliens for commercial advantage or private financial gain.[6]
II. ISSUES ON APPEAL
Dominguez raises the following issues on appeal: (1) whether the district court erred in denying his motion for judgment of acquittal because the evidence does not support any of his convictions; (2) whether the court erred in excluding evidence of the Web-Foot/Dry-Foot policy and the Cuban Adjustment Act; (3) whether the court erred in precluding the testimony of an expert immigration witness; (4) whether the court erred in precluding evidence of the Major League baseball free agency rules; (5) whether the court erred in admitting evidence of the Betaneourt-Beltran smuggle under Federal Rule of Evidence 404(b); and (6) whether the court erred in denying his requested jury instructions.[7]
*1061 III. DISCUSSION
A. Sufficiency of the Evidence
Dominguez contends that the evidence at trial was insufficient to support his convictions for smuggling, transporting, and harboring aliens. We review challenges to the sufficiency of the evidence in criminal cases de novo, viewing the evidence in the light most favorable to the government. United States v. Williams, 527 F.3d 1235, 1244 (11th Cir.2008) (citation omitted). “[E]vidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.” Id. (citation omitted) (internal quotation marks omitted). “We assume that the jury made all credibility choices in support of the verdict” and “accept all reasonable inferences that tend to support the government’s case.” Id. (citation omitted).
1. Transporting (Counts 44-48)
Dominguez contends that the evidence is insufficient to support his conviction for transporting aliens in violation of 8 U.S.C. § 1324(a)(l)(A)(ii). That statute punishes:
Any person who :.. knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law....

Id.

Dominguez argues that the evidence failed to prove that he transported the Cuban players within the United States to further the players’ unlawful presence.[8] We agree.
The evidence at trial showed that Dominguez sent Ramon Batista to pick up the *1062 five players in Miami and take them to Los Angeles. They arrived in Los Angeles on August 26, 2004. Shortly after the players arrived, they were taken to Humberto Gray, an experienced immigration attorney — who has done immigration work for TSI players since the late 1990s — to process the players through immigration. By October, Gray had interviewed the players and was doing whatever was necessary, including having them undergo examinations by physicians approved by USCIS, to process them. Gray told Dominguez that he had set up an “initial appointment” for the players at the USCIS Los Angeles office sometime toward the end of October. Gray had the appointment changed to November because Dominguez had a conflict and would be unable to accompany the players to the USCIS office in October. On November 19, 2004, Gray and Dominguez accompanied the five Cubans to the USCIS to apply for asylum and parole. They were paroled.
The evidence further showed that, from the time the players arrived on August 23, 2004 to the time they were paroled on November 19, 2004, the players lived freely and openly. They played baseball, went out with friends, ate at restaurants, and watched professional baseball games. On November 12, 2004, the players were “showcased” in front of scouts from almost every Major League team.
Based on this evidence, a reasonable jury could not find beyond a reasonable doubt that Dominguez transported the Cuban players from Miami to Los Angeles in order to further their illegal status. To the contrary, the players were taken to an experienced immigration attorney shortly after arriving in Los Angeles for the purpose of processing the players through immigration, and the players were paroled three months later. During that three month period, the players lived freely, openly, and in no way acted in a manner suggesting they were avoiding immigration officials. We therefore conclude that the evidence was insufficient to support Dominguez’s conviction for transporting under § 1324(a) (1) (A) (ii) and the district court erred in denying Dominguez’s motion for judgment of acquittal on these counts.
In arguing that the evidence is sufficient to prove that Dominguez acted to further the illegal status of the Cuban players, the Government relies on the fact that Dominguez waited about three months before taking the players to immigration officials. The Government does not, however, point to any statute or regulation with a specific time requirement for presenting Cubans to immigration officials. Considering that the immigration process started shortly after the players arrived, as well as the circumstances surrounding the purpose of the trip to Los Angeles, we cannot say that the three-month delay in reporting to immigration authorities supports the conclusion that Dominguez intended to transport the players in order to further their illegal immigration status.[9]
2. Harboring (Counts 49-53)
Dominguez contends that the evidence is insufficient to support his convic *1063 tion of harboring aliens in violation of 8 U.S.C. § 1824(a)(1)(A)(iii). That statute punishes:
Any person who ... knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation____

Id.

Dominguez argues that the evidence did not establish that he “knowingly concealed, harbored, or shielded from detection” the five Cuban players from United States immigration officials.[10] We agree.
The jury was given the following instruction defining the phrase “conceal, harbor or shield from detection”: “To ‘conceal, harbor or shield from detection’ includes any knowing conduct by the defendant tending to substantially facilitate an alien’s escaping detection thereby remaining in the United States illegally.” (R.14 at 1383; Dkt. 217 at 22.) The evidence does not support the conclusion that Dominguez substantially facilitated the Cuban players’ escaping detection from immigration officials. As noted in discussing the transporting convictions, Dominguez took the players to experienced immigration counsel shortly after they arrived to process them through immigration, and the players in no way engaged in conduct suggesting that they were hiding from or otherwise avoiding immigration officials. We therefore conclude that the evidence was insufficient to support Dominguez’s convictions under § 1324(a)(l)(A)(iii) and the district court erred in denying Dominguez’s motion for judgment of acquittal on these counts.
3. Smuggling Convictions: Conspiracy to Smuggle, Aiding and Abetting the Attempt to Smuggle, and Aiding and Abetting an Actual Smuggle
a. Conspiracy to Smuggle (Count 1)
Dominguez contends that the evidence was insufficient to support his conviction of conspiring, in violation of 18 U.S.C. § 371,[11] to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). That statute punishes:
Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien....

Id.

Thus, the elements of smuggling aliens in violation of 8 U.S.C. § 1324(a)(2) are (1) that the defendant knowingly brought an alien to the United States; and (2) that the defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization *1064 to come to or enter the United States. To establish a criminal conspiracy under 18 U.S.C. § 371, “the Government must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement.” United States v. Ndiaye, 434 F.3d 1270, 1294 (11th Cir.2006) (citation omitted). The court also instructed the jury that the Government had to prove Dominguez willfully joined the conspiracy knowing its unlawful purpose. The crime of conspiracy is complete upon the commission of an overt act. See United States v. Arias, 431 F.3d 1327, 1340 n. 18 (11th Cir.2005).
Dominguez argues that the evidence did not establish that he and Medina conspired to bring the five Cuban players to the United States without prior official authorization and that he knowingly participated in the conspiracy. Dominguez points out that, while Medina testified that Dominguez requested the five Cuban players, Medina did not testify that Dominguez knew they would arrive in the United States without prior official authorization.
The evidence was sufficient to prove that Dominguez willfully conspired to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). The principle is well-established that a conspiratorial agreement “may be proven by circumstantial evidence, including ‘inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme.’ ” United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir.2005) (citation omitted). Here, the totality of the circumstantial evidence supports the jury’s conclusion that Dominguez willfully conspired with Medina to bring the five Cuban players to the United States and that Dominguez knew or recklessly disregarded the fact that the Cuban players did not have prior official authorization to come to the United States.
Medina testified that he had an extensive and ongoing smuggling relationship with Dominguez. The relationship started in 2003 when Medina and Dominguez agreed to smuggle Betancourt and Beltran to the United States so they could pursue professional baseball careers. This prior smuggle involved the same conduct as the charged smuggling offenses and occurred less than a year prior to the charged smuggling offenses. Further, Dominguez paid Medina $125,000 in order to fund the smuggling of the five Cuban players. Dominguez sent the payments to the accounts of Medina’s friends and family who then paid Medina. And, to pay off the $25,000 balance that Dominguez owed Medina for the smuggle, Dominguez had the players sign contracts obligating them to pay a percentage of their baseball earnings to Medina. Finally, the players arrived in the United States in a speed boat and were dropped off in the water off Deer Key, Florida, around 5 a.m. Based on the totality of the evidence, a reasonable jury could find that Dominguez knew or recklessly disregarded the fact that the five Cuban players did not have prior official authorization to come to the United States; that Dominguez willfully conspired with Medina — that is, acted with the specific intent to do something the law forbids; and that Medina knowingly brought the players to the United States in violation of § 1324(a)(2).
The conspiracy count in the indictment, Count 1, also charged a conspiracy to transport aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(ii), and a conspiracy to harbor aliens, in violation of 8 U.S.C. § 1324(a)(l)(A)(iii). “[WJhere an indictment alleges a conspiracy to commit several offenses against the United States, the *1065 charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses.” United States v. Johnson, 713 F.2d 633, 646 (11th Cir.1983) (cita-' tion omitted). The jury’s verdict form clearly indicates that they found that Dominguez conspired to commit each of the substantive offenses: smuggling, transporting, and harboring. (R.2-223.) Because the evidence is sufficient to support the conviction for conspiracy to commit alien smuggling, we affirm the conspiracy conviction on Count 1.
b. Aiding and Abetting the Attempt to Smuggle (Counts 5, 6, 10, 13, 19)
Dominguez contends that the evidence was insufficient to support his convictions of aiding and abetting, in violation 18 U.S.C. § 2,[12] the attempt to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). These convictions were based on Dominguez’s conduct with respect to the unsuccessful smuggle of the five Cuban players in July 2004, about a month prior to the successful smuggle.
Section 1324(a)(2), cited above, prohibits any person from knowingly bringing or attempting to bring to the United States an alien who does not have prior official authorization to enter the United States. See 8 U.S.C. § 1324(a)(2). “To convict for attempt, the government must prove: (1) the defendant was acting with the kind of culpability otherwise required for the commission of the crime for which he is charged with attempting; and (2) the defendant was engaged in conduct that constitutes a substantial step toward the commission of the crime.” United States v. Carothers, 121 F.3d 659, 661 (11th Cir.1997) (citing United States v. Mandujano, 499 F.2d 370, 376 (5th Cir.1974)).
To prove a substantive alien-smuggling offense under a theory of aiding and abetting, pursuant to 18 U.S.C. § 2, the evidence must establish that “(1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission.” United States v. Camacho, 233 F.3d 1308, 1317 (11th Cir.2000) (citation omitted).
The evidence was sufficient to prove that Dominguez aided and abetted the attempt to bring aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). First, the attempted smuggling offense under § 1324(a)(2) was committed in July 2004 when Medina hired Geoffrey Rodrigues to bring the five Cuban baseball players to the United States, and Rodrigues was caught bringing the players to the United States. Second, Dominguez contributed to and furthered that offense by paying Medina $100,000; Medina testified that he would not attempt the July 2004 smuggle without the $100,000 payment for the previous Betancourt-Beltran smuggle. Third, the amount of this payment and the irregular manner of payment support the jury’s conclusion that Dominguez intended to aid the commission of the July 2004 smuggle. See United States v. Lopez, 484 F.3d 1186, 1199 (9th Cir.2007) (en banc) (“A financier who organizes and funds a smuggling operation, ... whether located in or outside of the United States, may be said to have ‘associated himself with the venture, participated in it as in something he wished to bring about, and sought by his action to *1066 make it succeed.’ ” (alterations omitted) (citation omitted)). We therefore reject Dominguez’s challenge to the sufficiency of the evidence for his conviction of aiding and abetting the attempted smuggling of the five players in July 2004.
c. Alien Smuggling (Counts 28, 29, 33, 35, 40)
Dominguez contends that the evidence was insufficient to support his conviction of aiding and abetting the bringing of aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). These convictions were based on Dominguez’s conduct with respect to the successful smuggle of the Cuban players in August 2004.
The evidence was sufficient to prove that Dominguez aided and abetted the bringing of aliens to the United States in violation of 8 U.S.C. § 1324(a)(2). As noted in the context of the other convictions, Dominguez’s role in the prior Betancourt-Beltran smuggle; the substantial amount of payment to Medina both before and after the players’ arrival; the contracts that Dominguez had the players sign with Medina to pay off the smuggling debt; and the time, location, and manner in which the players arrived support the conclusion that Dominguez aided and abetted the smuggling of the five Cuban players in August 2004.
d. Enhanced Sentence Under 8 U.S.C. § 1324(a)(2)(B)(ii)
Dominguez also challenges the sufficiency of the evidence with respect to the jury’s finding that he participated in the smuggling operation, in violation of 8 U.S.C. § 1324(a)(2), for the purpose of commercial advantage or financial gain. The punishment under § 1324(a)(2) is enhanced if the smuggling offense is done “for the purpose of commercial advantage or private financial gain.” 8 U.S.C. § 1324(a)(2)(B)(ii).[13] Dominguez argues that the evidence did not establish that he smuggled the Cuban players “for the purpose of commercial advantage or private financial gain” because he actually lost money after the players arrived in the United States. He stresses that none of the five players signed Major League contracts, and the three players who signed Minor League contracts did not sign for enough money to trigger a substantial fee. We reject this argument. The enhanced punishment under § 1324(a)(2)(B)(ii) does not turn on the financial success of the smuggling venture. As the Second and Ninth Circuits have pointed out, the statute “does not require evidence of an ‘actual payment or even an agreement to pay’ but merely requires that the defendant acted ‘for the purpose of financial gain.’ ” United States v. Kim, 435 F.3d 182, 185 (2d Cir.2006) (quoting United States v. Angwin, 271 F.3d 786, 805 (9th Cir.2001)). The evidence at trial supported the jury’s conclusion that Dominguez conspired to commit, and aided and abetted, the smuggling of the Cuban players to the United States so that he could sign them up as clients and collect a fee based on a percentage of their future earnings. Dominguez, moreover, paid a lot of money, around $125,000, to finance the players’ smuggle, which supports the inference that Dominguez expected a return on his investment. We therefore reject Dominguez’s challenge to the sufficiency of the *1067 evidence supporting the financial-gain enhancement under § 1324(a)(2)(B)(ii).[14]
e. Arguments Pertaining to the Cuban Adjustment Act and the Wet-Foot/Dry-Foot Policy
Dominguez contends that he reasonably believed the Cuban Adjustment Act (“CAA”) and the Web-FootyDry-Foot policy gave the players legal status in the United States. Thus, he argues, he lacked the intent required to support his convictions for smuggling under 8 U.S.C. § 1324(a)(2).[15] We reject this argument.
United States immigration law and policy afford special treatment to Cuban nationals who come to the United States. Under the Cuban Adjustment Act, a native or citizen of Cuba, who has been inspected and admitted or paroled into the United States and has been physically present in the United States for at least two years, can apply for permanent residency in the United States.[16] By taking advantage of the CAA, Cuban nationals, who have no documents authorizing their presence in the United States, can remain in the United States without demonstrating that they suffered persecution or proving refugee status.[17] The benefits of the CAA, however, can only apply to those Cubans who reach United States soil (those with “dry feet”) while Cubans who are interdicted at sea (those with “wet feet”) are repatriated to Cuba. This rule is commonly referred to as the “WeWFoot/Dry-Foot” policy.[18] Under the Department of Immigration and Naturalization Service’s Meissner Memorandum, the Wet-Foot/Dry-Foot policy applies to Cubans regardless of whether they entered the United States at a designated port-of entry. Memorandum from Doris Meissner, Comm’r, Immigration & *1068 Naturalization Serv., Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a Designated Port-of-Entry (Apr. 19, 1999) [hereinafter Meissner Memorandum], Dominguez claims that knowledge of this policy precludes a finding he possessed an intent to violate the law. This obliges us to decide what level of mental culpability 8 U.S.C. § 1324(a)(2) requires.
Section 1324(a)(2) requires proof of a defendant’s mental state in two ways. First, the statute explicitly commands that a defendant know or recklessly disregard “the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States.” 8 U.S.C. § 1324(a)(2). Furthermore, a smuggling offense occurs “regardless of any official action which may later be taken with respect to such alien.” Id. Second, a defendant must knowingly bring or attempt to bring an alien to the United States. Id. Although the statutory language omits a mens-rea requirement as to this second element, a presumption exists in favor of a mens-rea requirement for each element of an offense. United States v. X-Citement Video, Inc., 513 U.S. 64, 72, 115 S.Ct. 464, 469, 130 L.Ed.2d 372 (1994). Moreover, a court may treat the mens rea Congress provided in the statute as modifying each element that follows it. See id. at 79, 115 S.Ct. at 472 (Stevens, J., concurring). Thus, we decide a defendant must knowingly bring an alien to the United States.
However, a specific intent to violate the law is not required. As an initial matter, “courts obviously must follow Congress’ intent as to the required level of mental culpability for any particular offense.” United States v. Bailey, 444 U.S. 394, 406, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980); see also Liparota v. United States, 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985) (“The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute.” (citation omitted)). The Supreme Court has also said that “unless the text of the statute dictates a different result, the term ‘knowingly’ merely requires proof of knowledge of the facts that constitute the offense.” Bryan v. United States, 524 U.S. 184, 193, 118 S.Ct. 1939, 1946, 141 L.Ed.2d 197 (1998); see also Staples v. United States, 511 U.S. 600, 622 n. 3, 114 S.Ct. 1793, 1805, 128 L.Ed.2d 608 (1994) (Ginsburg, J., concurring) (“The mens rea presumption requires knowledge only of the facts that make the defendant’s conduct illegal....” (citations omitted)); United States v. Freed, 401 U.S. 601, 612, 91 S.Ct. 1112, 1119, 28 L.Ed.2d 356 (1971) (Brennan, J., concurring) (“If the ancient maxim that ‘ignorance of the law is no excuse’ has any residual validity, it indicates that the ordinary intent requirement — mens rea — of the criminal law does not require knowledge that an act is illegal, wrong, or blameworthy.”). When a statute proscribes conduct done “willfully,” then the “jury must find that the defendant acted ... with knowledge that his conduct was unlawful.” Bryan, 524 U.S. at 193, 118 S.Ct. at 1946.
Requiring willful conduct in this instance is contrary to the plain language of the statute and its legislative history (discussed in more detail below), and would functionally eliminate the “reckless disregard” language Congress included in the statute. Congress was not silent as to mental culpability in § 1324(a)(2). The statute explicitly prohibits conduct done “knowing[ly].” Had Congress desired to punish only “willful” conduct, Congress could have drafted the statute to say as *1069 much. The statute’s prohibition on bringing an alien in “reckless disregard” of the alien’s unauthorized status furthers our conclusion that Congress has spoken clearly to the mens-rea element of the § 1324(a)(2) offense. “Reckless disregard,” standing alone, may satisfy the mens-rea element of an offense. See United States v. Mussaleen, 35 F.3d 692, 698 (2d Cir.1994). We decline to adopt a mens rea different than the one chosen by Congress. We hold that willful conduct is not required to violate 8 U.S.C. § 1324(a)(2).
Our interpretation of 8 U.S.C. § 1324(a)(2) is strongly supported by its statutory history. That history, as pertinent to this case, begins with our decision in United States v. Zayas-Morales, 685 F.2d 1272 (11th Cir.1982). Zayas-Morales involved the criminal prosecution of over 300 American vessel owners, captains, and crew members responsible for transporting over 125,000 undocumented Cubans from Mariel Harbor, Cuba to Key West, Florida (a designated port-of-entry) in 1980, in what has been called the “Freedom Flotilla.” Id. at 1273-74. The defendants were indicted under 8 U.S.C. § 1324(a)(1) (1976), the predecessor to the version of the statute, 8 U.S.C. 1324(a)(2), involved in this case. Id. at 1273. The government charged the defendants with “bringing] into” the United States any alien “not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States.”[19] See id. at 1274 & n. 1 (quoting 8 U.S.C. § 1324(a)(1) (1976), amended by 8 U.S.C. § 1324(a)(1) & 1324(a)(2) (1986)). For purposes of deciding the defendants’ motion to dismiss the indictments, the government and the defendants stipulated that the defendants presented the Cuban aliens to immigration officials at Key West and that the defendants’ intention in doing so was to allow the aliens to seek legal status in the United States. Id. at 1274, 1277. Based on these stipulated facts, we affirmed the dismissal of the indictments. Id. at 1278. We held that where the defendants were bringing in aliens with the intention of submitting those aliens to the proper officials so that the aliens might seek legal status in the United States, the defendants lacked the general intent necessary to violate 8 U.S.C. § 1324(a)(1) (1976). Id.
Following our decision in Zayas-Morales, in 1986, Congress substantially rewrote 8 U.S.C. § 1324(a). Pertinent to this case, Congress added § 1324(a)(2). Unlike the statute we interpreted in Zayas-Morales which did not contain a mental state element, in the amended statute at § 1324(a)(2), Congress required that the defendant act knowingly. Compare 8 U.S.C. § 1324(a)(1) (1976), with 8 U.S.C. § 1324(a)(2). Section 1324(a)(2) now punishes any person who knowingly brings to *1070 the United States an alien while knowing or recklessly disregarding the fact that the alien has not received “prior official authorization to come to, enter, or reside in the United States.” The statute explicitly states the offense occurs “regardless of any official action which may later be taken with respect to such alien.” 8 U.S.C. § 1324(a)(2). The legislative history explains that Congress intended to “expand the scope of activities proscribed by federal law to reach the conduct of those participating in such operations as the Mariel boatlift.” United States v. Nguyen, 73 F.3d 887, 892 (9th Cir.1995) (citation omitted) (internal quotation marks omitted); see also United States v. Garcia-Cordero, 610 F.3d 613, 619 (11th Cir.2010) (Korman, J., concurring) (noting that Congress enacted 8 U.S.C. § 1324(a)(2) to punish the type of conduct at issue in the Mariel “Freedom Flotilla” cases). Given that Congress’s goal in amending § 1324 was to expand the number of activities prohibited by that section, and Congress redrafted the provision to dictate the mental state necessary to violate the statute, we are not bound by our decision in Zayas-Morales.
In United States v. Barajas-Montiel, 185 F.3d 947, 951-53 (9th Cir.1999), the Ninth Circuit held that specific “criminal intent is required for conviction of the felony offenses of 8 U.S.C. § 1324(a)(2)(B).”[20] We do not find the Ba-rajas-Montiel opinion persuasive. The Barajas-Montiel court correctly recognized that the language of the statute does not require that the defendant specifically intend to violate the law. Id. at 951. It then decided the § 1324(a)(2)(B) felony offenses must contain a specific criminal intent element lest the statute run afoul of the mens-rea presumption of the criminal law. Id. at 952-53. But, as we have said, conduct done knowingly or with reckless disregard is sufficient to satisfy the mensrea presumption. Under these circumstances, we decline to add a specific criminal intent element when Congress has chosen not to do so.
Because willful behavior is not required, the special status afforded Cubans under the CAA and the Wet-Foot/Dry-Foot policy is not relevant to the state of mind required to commit smuggling in violation of 8 U.S.C. § 1324(a)(2). The CAA and the Wet-Foot/Dry-Foot policy do not provide “prior official authorization” for an undocumented Cuban to come to the United States because an undocumented Cuban must still be paroled, a process that “reclassifiies] an alien from one who is illegally remaining in the United States to one who is legally remaining in the United States regardless of how entry into the United States was effected.” United States v. Medina-Garcia, 918 F.2d 4, 8 (1st Cir.1990). Thus, the CAA and the Wet-Foot/Dry-Foot policy instead pertain to “official action which may later be taken with respect to” the five Cuban players. See 8 U.S.C. § 1324(a)(2). By the plain language of the statute, the effect of the CAA and the WeUFoot/Dry-Foot policy on the players’ immigration status after they arrive in the United States is not relevant to a conviction for smuggling Cubans into the United States under § 1324(a)(2). And Dominguez’s knowledge of these policies (if he had such knowledge) does not make the evidence supporting his smuggling convictions insufficient.
*1071 Two of these smuggling offenses — the conspiracy and attempt offenses — were complete prior to the time the Cuban players arrived in the United States. And, the smuggling offense was complete upon their arrival.
B. Jury Instructions
Dominguez argues that the district court erred in failing to give his requested jury instructions. We review a district court’s refusal to submit a defendant’s requested jury instruction for an abuse of discretion. United States v. Morris, 20 F.3d 1111, 1114 (11th Cir.1994) (citation omitted). In determining whether the district court abused its discretion by refusing to give a requested jury instruction, we consider three factors: “(1) whether the requested instruction is a substantially correct statement of the law; (2) whether the jury charge given addressed the requested instruction; and (3) whether the failure to give the requested instruction seriously impaired the defendant’s ability to present an effective defense.” United States v. Chirinos, 112 F.3d 1089, 1101 (11th Cir.1997) (citation omitted). In this case, we reverse Dominguez’s counts of conviction for transporting aliens and harboring aliens, so we need not address whether the refusal to give a jury instruction pertaining to these counts was error. See United States v. Siegelman, 640 F.3d 1159, 1177 n. 26 (11th Cir.2011) (declining to address challenge to jury instruction pertaining to a count of conviction that has been reversed). We only address whether the refusal to give certain instructions affected the smuggling convictions.
Dominguez argues that the court erred in refusing to instruct the jury that a Cuban national arriving in the United States from Cuba is not required to arrive at a designated port of entry, but is permitted to arrive at any place and thereafter be processed by immigration authorities for inspection and adjustment. The instruction relates to the special treatment afforded Cubans under the CAA, Meissner Memorandum, and the Wet-Foot/Dry-Foot policy. As discussed above, this special treatment has no bearing on the knowledge a defendant must have to commit the smuggling offenses because those policies pertain to later official action taken with respect to the alien. We therefore conclude that the denial of this instruction did not impair Dominguez’s ability to defend against the smuggling charges.
Dominguez contends that the court erred in refusing to instruct the jury that he is entitled to rely in good faith on the advice of counsel concerning the players’ immigration status. The timing and nature of Dominguez’s conversations with counsel are not entirely clear from the record. To the extent Dominguez received advice from counsel only after the players arrived in the United States, the adviee-ofcounsel instruction has no relevance to Dominguez’s smuggling convictions. Furthermore, no evidence suggested Dominguez fully disclosed the nature of the smuggling plan to an attorney, an important component of the good faith defense. The denial of this instruction did not impair Dominguez’s ability to defend against the smuggling charges.
Dominguez argues that the court erred in refusing to instruct the jury that specific intent — that the Dominguez acted willfully — is an element of the smuggling charges. Similarly, he argues that the court erred in refusing to instruct the jury that a mistake of fact is a complete defense to the smuggling charges. The jury instructions regarding the § 1324(a)(2) smuggling offenses correctly addressed all elements of the offenses.
*1072 The district court instructed the jury, in accord with a plain reading of the statute, that in order to convict for alien smuggling the Government had to prove beyond a reasonable doubt:
First: That the defendant knowingly brought an alien to the United States;
Second: That the defendant knew or was in reckless disregard of the fact that the alien had not received prior official authorization to come to or enter the United States; and
Third: That the offense was done for the purpose of commercial advantage or private financial gain.
(R. 14 at 1380-81; Dkt. 217 at 19.)
The jury was instructed that “knowingly” means “that the act was done voluntarily and intentionally and not because of mistake or accident.” (R. 14 at 1384-85; Dkt. 217 at 24.) As we have said, 8 U.S.C. § 1324(a)(2) does not contain a “willful” element. Because the instructions given by the district court were correct statements of the law, we find no abuse of discretion in the refusal to give a separate instruction on specific intent and mistake of fact.
Dominguez also contends that the court’s instruction should only include “knowing” or “reckless disregard” but not both states of mind. This argument is meritless. Section 1324(a)(2) includes both knowledge and reckless disregard as alternative states of mind. See 8 U.S.C. § 1324(a)(2) (“Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States.... ” (emphasis added)). And, both states of mind were properly charged in the indictment and supported by the evidence. We find no abuse of discretion in giving the reckless disregard instruction.
The jury was also instructed that Dominguez had to willfully join the conspiracy. (R. 14 at 1376; Dkt. 217 at 13.) The court also correctly defined “willfully” as an act “committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose to either disobey or disregard the law.” (R. 14 at 1385; Dkt. 217 at 24.) It is not clear from the Appellant’s Brief that Dominguez objects to the conspiracy charge; if he does, we do not know the substance of the objection. The objection is therefore waived. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n. 6 (11th Cir.1989).
The instructions also adequately covered Dominguez’s defense theory. Dominguez appears to recast his proposed instructions regarding good faith reliance on counsel, specific intent, mistake of fact, and the status of a Cuban national arriving at other than a designated port of entry as theory of defense instructions. As we have already stated, the district court did not abuse its discretion by refusing to give these instructions. The court’s theory of defense instruction told the jurors it was Dominguez’s theory of the case that he “never entered or intended to enter into any conspiracy to bring aliens into the United States illegally, ... nor did he knowingly engage in illegal alien smuggling or attempt to illegally smuggle aliens.” (R. 14 at 1386; Dkt. 217 at 26.) This instruction adequately covered Dominguez’s theory of defense — that he was unaware the players were smuggled from Cuba.
Dominguez argues that the court erred in refusing to revise its instruction on pri- or-bad-acts evidence admitted under Federal Rule of Evidence 404(b). This challenge is vague and without merit. The district court gave the pattern instruction on similar act evidence and did not abuse *1073 its discretion in refusing to revise this instruction.
C. Evidentiary Issues
1. Admission of Evidence of Betancourt-Beltran Smuggle Under Rule 404(b)
Dominguez argues that the district court abused its discretion in admitting testimony regarding his involvement with the smuggling of Betancourt and Beltran, two other baseball players. The district court permitted Medina to testify that, eight months before the smuggling of the players in this case, he and Dominguez conspired to smuggle Betancourt and Beltran to the United States. The district court admitted the testimony under Federal Rule of Evidence 404(b), concluding that the Betancourt-Beltran smuggle was relevant to Dominguez’s intent to commit the smuggling charges in the indictment. We review for abuse of discretion a district court’s ruling on the admissibility of evidence of uncharged conduct under Rule 404(b). United States v. Perez, 443 F.3d 772, 774 (11th Cir.2006) (citation omitted).
“Rule 404(b) permits the admission of prior-bad-acts evidence to show motive, preparation, knowledge, and intent, as well as an ongoing scheme or plan.” Id. at 779 (citation omitted). We apply a three-part test to evaluate the admissibility of evidence under Rule 404(b): “(1) the evidence must be relevant to an issue other than the defendant’s character; (2) there must be sufficient proof so that the factfinder could find that the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by undue prejudice.” Id. (citation omitted); see also United States v. Miller, 959 F.2d 1535, 1538 (11th Cir.1992) (en banc) (outlining same test).
Applying this test, we conclude that the district court did not abuse its discretion in admitting testimony of the Betancourt-Beltran smuggle. First, evidence of the B etancourt-B eltran smuggle was relevant to establish Dominguez’s intent with respect to the conspiracy smuggling offense and the substantive alien-smuggling counts. By Dominguez’s argument—that he did not know or recklessly disregard the fact that the Cuban players did not have prior authorization to enter the United States—Dominguez made intent an issue in the case, making the evidence of the Betancourt-Beltran smuggle relevant for non-propensity purposes. See Perez, 443 F.3d at 779-80. Second, Medina’s testimony provided a sufficient basis for the jury to find that Dominguez conspired with Medina to commit the BetancourF-Beltran smuggle. Third, the district court did not abuse its discretion when it determined the probative value of the Betancourh-Beltran smuggle, which involved the same conduct as the charged conspiracy and substantive smuggling offenses and occurred less than a year prior to the smuggle in this case, outweighed its prejudicial effect. See id. at 780. We therefore conclude that the district court did not abuse its discretion in admitting evidence of the Betancourt-Beltran smuggle as 404(b) evidence.
2. Exclusion of the CAA, Wet-Foot/ Dry-Foot Policy, and Expert Immigration Testimony
Dominguez contends that the district court erred in'excluding evidence pertaining to the CAA and the Wet-Foot/ Dry-Foot policy, and in excluding the testimony of an immigration judge regarding the status of Cuban nationals under United States immigration law. He claims that this evidence was crucial in determining whether he had the required intent to smuggle, transport, and harbor the Cuban *1074 players. We review determinations of the admissibility of evidence for abuse of discretion. United States v. Miles, 290 F.3d 1341, 1351 (11th Cir.2002) (citation omitted). We likewise review for abuse of discretion the district court’s decisions regarding the admissibility of expert testimony. United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir.2004) (en banc) (citation omitted).
In section III.A, we discuss the sufficiency of the evidence for the smuggling convictions and explain why the CAA and the Wet-Foot/Dry-Foot policy have no relevance to the sufficiency of the evidence to support these smuggling convictions. For the same reasons, they have no relevance to Dominguez’s defense to the smuggling charges. In fact, Dominguez did not contend in the district court that the immigration judge’s testimony about these policies would have assisted his defense to the smuggling charges. While arguing for the admission of testimony by the immigration judge, Dominguez’s counsel proffered that the expert would testify that “[y]ou can’t put a foreign national on a boat and bring them to the United States without permission. That’s just not allowed, doesn’t matter, Cuban national or anybody else, you can’t do that.” (R.ll at 897.) Because the immigration judge’s testimony on the smuggling counts would have been detrimental to Dominguez, the immigration judge’s testimony could not have changed the jury’s verdict on the smuggling counts. This excerpt regarding the immigration judge’s testimony highlights that the CAA and the WeWFoot/Dry-Foot policy are not relevant to the smuggling convictions we are affirming in this case. As we have said, two of these smuggling offenses — the conspiracy and attempt offenses — were complete prior to the time the Cuban players arrived in the United States. At least as to these two offenses, it is hard to imagine the relevance of policies that address Cubans’ immigration status after their arrival in this country. The exclusion of evidence about them did not, as to the smuggling convictions, affect Dominguez’s substantial rights. See Fed. R.Crim.P. 52(a).
To the extent evidence of the CAA and the Wet-Foot/Dry-Foot policy relate to Dominguez’s convictions of transporting and harboring aliens, we need not address these purported errors because we reverse those convictions for insufficiency of the evidence. See United States v. Law, 528 F.3d 888, 898-99 (D.C.Cir.2008) (declining to address evidentiary errors relating to counts of conviction reversed on other grounds).
3. Exclusion of Major League Baseball Free Agency Rules
Dominguez contends that the district court erred in excluding evidence pertaining to the Major League Baseball free agency rules. He argues the evidence was necessary to respond to the Government’s theory that he delayed the players’ immigration processing in order to manipulate the free agency system.
To the extent the exclusion of the Major League baseball rules relates to Dominguez’s convictions for transporting and harboring the players, we need not address these purported errors because we reverse those convictions for insufficiency of the evidence. Id.
To the extent the free agency rules are relevant to the smuggling convictions, we conclude that any error in excluding this evidence, if there was error, was harmless. See Frazier, 387 F.3d at 1266 n. 20 (requiring reversal in a criminal case only if erroneous evidentiary decision “[had] a ‘substantial influence’ on the outcome of a case or [left] ‘grave doubt’ as to whether they affected the outcome of a *1075 case” (citation omitted)). Dominguez argues that the free agency rules were necessary to rebut the Government’s theory regarding the three-month delay in the players’ immigration processing. .That delay has no relevance to whether Dominguez conspired to smuggle and assisted in smuggling the Cuban players to the United States. Thus we are not left with a grave doubt that the exclusion of the free agency rules affected the smuggling convictions.
IV. CONCLUSION
Count 1 charges Dominguez with conspiring to bring aliens to the United States for the purpose of commercial gain or financial advantage, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 371. We affirm Dominguez’s conviction and sentence on this count.
Counts 5, 6, 10, 13, and 19 charge Dominguez with aiding and abetting the attempt to bring in aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. We affirm Dominguez’s convictions and sentences on these counts.
Counts 28, 29, 33, 35, and 40 charge Dominguez with aiding and abetting the bringing of aliens to the United States for the purpose of commercial advantage and private financial gain, in violation of 8 U.S.C. § 1324(a)(2), (a)(2)(B)(ii), and 18 U.S.C. § 2. We affirm Dominguez’s convictions and sentences on these counts.
We reverse Dominguez’s convictions on all other counts and vacate his sentences on these other counts.
AFFIRMED IN PART, REVERSED IN PART, AND VACATED IN PART.

. Because we must determine whether the evidence is sufficient to support Dominguez's convictions, we state the evidence in the light most favorable to the Government. United States v. Robertson, 493 F.3d 1322, 1329 (11th Cir.2007).

.The indictment does not charge Dominguez with any crimes regarding the Betancourt-Beltran smuggle. The district court admitted evidence of this prior smuggle under Federal Rule of Evidence 404(b), concluding that the evidence was relevant to establish Dominguez’s intent to commit the smuggling offenses at issue in this case.

. Rodrigues pled guilty to a single smuggling conspiracy charge in this case.

. The jury acquitted Hernandez of all charges in this case. Despite Dominguez’s suggestion to the contrary, this acquittal is irrelevant to the sufficiency of the evidence supporting Dominguez’s convictions. See United States *1058 v. Mitchell, 146 F.3d 1338, 1344-45 (11th Cir.1998) (stating that jury verdicts are "insulated from review” on the ground that they are inconsistent (citing United States v. Powell, 469 U.S. 57, 68-69, 105 S.Ct. 471, 478-79, 83 L.Ed.2d 461 (1984)) (alterations omitted)).

. Batista pled guilty to a transporting charge in this case.

. Section 1324(a)(2)(B)(ii) states that where a "[§ 1324(a)(2) smuggling] offense [is] done for the purpose of commercial advantage or private financial gain” the defendant shall "be fined under Title 18 and shall be imprisoned ... in the case of a first or second violation of subparagraph ... (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.”

. Dominguez also raises other issues on appeal: (1) whether the court erred in granting the Government's motion for a continuance on the day of trial; (2) whether the court erred in denying Dominguez’s request for specific voir dire questions; and (3) whether the *1061 cumulative effect of multiple errors denied the defendant a fair trial.
As to issue one, we conclude that the court did not abuse its substantial discretion in granting the Government’s motion for a continuance following the hospitalization of the Government’s sole trial lawyer in this case. The record does not support Dominguez’s assertion that the motion was a deliberate act designed to gain an advantage, and Dominguez has not shown that he suffered significant prejudice as a result of the continuance. See United States v. Key, 76 F.3d 350, 354 (11th Cir.1996).
As to issue two, we conclude that the court did not abuse its wide discretion in limiting voir dire of the prospective juror panel. The voir dire questioning as a whole complied with “the essential demands of fairness” and "gave reasonable assurance to the parties that any prejudice of the potential jurors would be discovered.” United States v. Nash, 910 F.2d 749, 753 (11th Cir.1990) (citation omitted) (internal quotation marks omitted).
As to issue three, to the extent any evidentiary or instructional errors occurred, the cumulative effect of any such errors did not deny Dominguez a fair trial.

. Dominguez also argues that the evidence failed to prove that the Cuban players entered or remained in the United States "in violation of law.” According to Dominguez, under the CAA and the Wet-Foot/Dry-Foot policy, the Cuban players were legally present as soon as they touched dry land. The Government’s position, which the district court accepted, is that a Cuban who reaches United States soil remains “in violation of law” until they are inspected and admitted or paroled under 8 U.S.C. § 1255. In this case, the players arrived in Miami on August 23, 2004 and were not paroled until November 19, 2004. So, under the Government’s theory, the players were present in violation of law from August 23, 2004 to November 19, 2004.
We need not address whether the Government’s legal interpretation is correct because the transporting convictions must be reversed for reasons independent of whether the Cubans were present "in violation of law” from August 23, 2004 to November 19, 2004.

. As the Tenth Circuit has noted, the relevant evidence in establishing that a defendant acted in furtherance of an alien's illegal status will vary from case to case. See United States v. Barajas-Chavez, 162 F.3d 1285, 1289 (10th Cir.1999) (en banc). The circumstances of this case are unique. Our reversal of Dominguez’s convictions for transporting aliens should not be read as endorsing the idea that undocumented Cubans are free to wander indefinitely around the United States, or that they should not report to immigration officials as soon as possible. We simply hold that, under the facts of this case, the Government failed to prove that Dominguez transported the aliens to further their purported illegal status.

. Dominguez also argues, as he does for the transporting convictions, that the evidence failed to prove that the Cuban players entered or remained in the United States "in violation of law.” We need not address this argument because the harboring convictions, like thej transporting convictions, are reversed on other grounds.

. 18 U.S.C. § 371 states: If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

. 18 U.S.C. § 2 states:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

. The challenge to the financial-gain enhancement relates only to the smuggling convictions. The counts of conviction for transporting aliens, under 8 U.S.C. § 1324(a)(l)(A)(ii), and harboring aliens, under 8 U.S.C. § 1324(a)(l)(A)(iii), did not allege that those offenses were committed for commercial advantage or financial gain. See 8 U.S.C. § 1324(a)(l)(B)(ii).

. Our reversal of Dominguez's convictions for transporting and harboring aliens does not affect the five-year mandatory minimum sentence under 8 U.S.C. § 1324(a)(2)(B)(ii). Dominguez’s conspiracy conviction (Count 1), five attempted smuggling convictions (Counts 5, 6, 10, 13, 19) and five smuggling convictions (Counts 28, 29, 33, 35, 40) support the five-year statutory mandatory minimum sentence.

. Dominguez also argues that the CAA and the Wet-Foot/Dry-Foot policy show that he did not have the intent necessary to support his convictions for transporting and harboring aliens. As we explain above, independent of the CAA and the Wet-Foot/Dry-Foot policy, the evidence does not support these convictions and they must be reversed. We therefore need not address whether the CAA and the Wet-Foot/Dry-Foot policy had any bearing on the transporting and harboring convictions.

. See Cuban Adjustment Act, Pub.L. No. 89-732, § 1, 80 Stat. 1161 (1966) (codified as amended at 8 U.S.C. § 1255 (2006)). The Act states:
[T]he status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least two years, may be adjusted by the Attorney General ... to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence.

Id.

. For procedures governing asylum and proving refugee status, see generally 8 U.S.C. § 1158.

. The policy has its foundation in a bilateral migration agreement signed in 1994 between the United States and Cuba, often called the "Joint Communique.” See Cuba-United States: Joint Statement on Normalization of Migration, Building on the Agreement of September 9, 1994, 35 I.L.M. 327, 329 (stating that "migrants rescued at sea attempting to enter the United States will not be permitted to enter the United States, but instead will be taken to safe haven facilities outside the United States”).

. The statute at issue in Zayas-Morales, 8 U.S.C. 1324(a)(1) (1976), stated in pertinent part:
Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who — (1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise; any alien ... not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs ....

. A number of circuits have interpreted 8 U.S.C. 1324(a)(l)(A)(ii) as requiring that the defendant knowingly transport an alien to further a violation of the immigration law, or act "willfully in furtherance of the alien’s violation of the law." See, e.g., United States v. Parmelee, 42 F.3d 387, 390-91 & n. 5 (7th Cir.1994). That interpretation of § 1324(a)(1)(A)(ii) does not demand that § 1324(a)(2) contain a willful element.