[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15797

_____

D.C. Docket No. 9:12-cr-80100-KAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VALENTINO BOWLEG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 28, 2014)

Before HULL, BLACK and FARRIS,[*] Circuit Judges.

PER CURIAM:

_____

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Valentino Bowleg appeals his convictions and 84-month total sentence for four counts of alien smuggling for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and one count of aiding and assisting an alien convicted of an aggravated felony to enter the United States, in violation of 8 U.S.C. § 1327.  After careful review of the briefs and entire record, and with the benefit of oral argument, we affirm Bowleg's convictions and sentences.

## I.  FACTUAL BACKGROUND

Bowleg's convictions arise out of the events of May 5-6, 2012, when Bowleg piloted a boat carrying aliens to U.S. waters.  Viewing the evidence presented at Bowleg's four-day trial in the light most favorable to the government, we describe (1) the voyage and (2) the subsequent statements Bowleg made to law enforcement after the boat's interception.  We then describe (3) Bowleg's testimony at trial, setting forth his own version of events.

### A.    May 5-6, 2012 Voyage

Around 8:30 PM, on May 5, 2012, defendant Bowleg and Terico Pratt[1] together piloted a 22-foot long motorboat to a beach in the Bahamas.  Thirteen aliens, nationals of different Latin American countries, waited on the beach for Bowleg and Pratt to transport them on the boat to the United States.[2]

---

[1]Bowleg and Pratt were charged separately.  As discussed further below, prior to Bowleg's trial, Pratt pled guilty to one count of alien smuggling for financial gain.
[2]The motorboat had no name or identification number on it.

2

The thirteen aliens had each paid a Bahamian man, known as "Nino" or "Junior," amounts ranging from $3,000 to $12,000 for Bowleg and Pratt to take them to the United States.[3] No alien had documentation authorizing entry into the United States. One of the passenger aliens was Richard Manuel Encarnacion-Perez who was previously deported from the United States. Encarnacion-Perez had convictions for conspiracy to possess fifty kilograms of cocaine with intent to distribute and armed robbery.

Once loaded with its passengers, the boat set off for the United States. Although fifteen total were on board, the boat's maximum occupancy was eleven, and it had only eight life jackets.

During the voyage towards the United States, Bowleg and Pratt took turns operating the boat, which traveled without using its lights. Bowleg and Pratt also took turns using a GPS-device to navigate the boat towards their destination— West Palm Beach, Florida— and binoculars to monitor and survey the waters for other boats.

At one point during the voyage, the boat ran out of gas. Bowleg and Pratt started to refuel, using gas tanks stored on the boat. Once Bowleg and Pratt started

---

[3]At trial, only four of the thirteen aliens testified about the cost of the voyage, and these aliens paid between $3,000 and $7,000 in cash. The undisputed facts in the presentence investigation report, however, showed that one alien agreed to pay as much as $16,000.

3

refueling the boat, two other passengers on the boat assisted Bowleg and Pratt. The boat then continued on its way.

Sometime later, while patrolling Florida's borders by aircraft, an agent for U.S. Customs and Border Protection spotted the boat, piloted by Bowleg and Pratt, on the aircraft's radar. The agent alerted the U.S. Coast Guard as to the boat's location. In the early hours of May 6, 2012, the U.S. Coast Guard intercepted the boat ten nautical miles west of West Palm Beach, Florida.

The occupants of the motorboat were taken into custody and transferred to a U.S. Coast Guard vessel for their safety because the motorboat was taking on water through a hole in the bilge area. An inventory of Bowleg's and Pratt's possessions revealed that they each possessed $1,000 of U.S. currency in $100 denominations.

**B.    May 6, 2012 Interview of Bowleg**

On May 6, Department of Homeland Security ("DHS") Special Agent Anderson Sullivan, in the presence of DHS Special Agent Kenneth Cisneros read Bowleg his Miranda[4] rights, in English, off of a form.[5] Agent Sullivan then read the form's waiver statement to Bowleg, providing: "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive

---

[4]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[5]Bowleg's native language is English.

4

them freely and voluntarily, without threat or intimidation . . . ."  Bowleg signed the waiver statement.

After waiving his Miranda rights, Bowleg told the agents that: (1) Bowleg washed boats for a Bahamian named Chris; (2) Chris brought people into the United States illegally and knew that Bowleg wanted to enter the United States; (3) Chris stated that he could transport Bowleg to the United States for $2,000; and (4) Bowleg told Chris that he did not have $2,000 and negotiated a price of $500 for the trip instead.

The agents told Bowleg that his story lacked credibility, especially in light of the $1,000 found during the inventory of his possessions.  The agents told Bowleg to "tell . . . the truth."

Bowleg then told the agents that: (1) Chris paid Bowleg $1,000 to assist Pratt in transporting a group of aliens to the United States; (2) Chris told Bowleg to "pick up" Pratt and then Pratt would drive the boat; (3) Bowleg supplied drinks to the aliens; (4) Bowleg operated the boat for a period of time, as had "many others" on board; (5) Bowleg held the GPS-device once to attempt to get the motorboat to West Palm Beach, Florida; and (6) Bowleg had substantial experience driving boats.

At that point in the interview, Bowleg asked to make a phone call. The agents told Bowleg that he could make a call after they finished the interview, and they wanted to hear the truth.

Bowleg then told the agents that: (1) Chris approached Bowleg and asked him to go to the United States; (2) Bowleg agreed to go to the United States; (3) Bowleg "drove the boat over to pick up" Pratt; (4) Pratt then "took control of the vessel" and drove it to pick up the aliens; (5) Bowleg helped the aliens on board the boat; and (6) Chris did not pay Bowleg $1,000 to go to the United States, but rather Bowleg obtained that amount by selling marijuana and doing "odd jobs" in the Bahamas.

During the interview, Bowleg consented to having his cell phone searched. Bowleg told the agents that Chris was listed as "MMI" and "C" in his phone's address book. Agents determined that, on May 5, 2012, Bowleg received nine incoming telephone calls from Chris, missed five calls from Chris, and made seven outgoing calls to Chris. Additionally, the agents determined that, at 8:52 PM on May 5, 2012, Chris sent a message to Bowleg stating, "check the sky." Shortly after, Bowleg responded by text, "Ok."

Agents also determined that, on May 5, Bowleg sent a text message to Pinke, his girlfriend who lived in the Bahamas, stating "baby, I send you five dollars." Pinke responded "thank you, baby, where you is." Bowleg replied that

6

he would be "gone all night," but that he would see Pinke "Tomorrow" (May 6). Pinke then said, "okay, baby, see you soon."

## C.    Bowleg's Version of Events on May 5-6, 2012

At trial, Bowleg testified that he was born in the Bahamas, lived in the United States for an indeterminate amount of time during his childhood, and at some point, returned to the Bahamas. Around 2012, Bowleg decided to reenter the United States. Bowleg paid an individual named Chris $500 to arrange his transport to the United States. Chris gave Bowleg a discounted price for the trip because Bowleg used to clean Chris's boat.

On May 5, 2012, Bowleg arrived at a beach by himself and boarded a boat driven by Pratt, who Bowleg had known since childhood. Bowleg did not know that Pratt was the captain of the boat that would take Bowleg to the United States until May 5, when Bowleg recognized Pratt as the boat's captain. Bowleg and Pratt cruised around the water for thirty minutes before returning to the beach.

Thirteen aliens arrived at the beach, and they boarded the boat without assistance. Bowleg knew that everyone on the boat was attempting to enter the United States illegally because "if they had papers, they wouldn't be on that boat; they would be on a commercial airline or a commercial boat or something."

While traveling, everyone on the boat, including Bowleg, used the binoculars on board to look at the large cruise ships passing the motorboat.

7

Bowleg also held the wheel of the motorboat whenever Pratt had to relieve himself off of the side of the boat, which happened three or four times. Bowleg, however, did not use the GPS-device to navigate the boat to a specific destination.

At one point during the journey, the boat stopped because it ran out of fuel. Bowleg did not assist in refueling the boat, but he did assist in restarting the boat's engine by pouring oil into a container for the purposes of restarting the engine.

Bowleg testified that his first statement to agents—that he was a passenger on the boat and paid $500 to Chris for transportation to the United States—was the truth. After making this first statement, Bowleg felt intimidated by the agents and told them that he wanted to call his family. One of the agents told Bowleg that he had to "tell [the agent] something he want[s] to hear" before Bowleg could call his family. The agents also told Bowleg that he was "getting five years." Bowleg then decided to give the agent a false statement so the agent would allow Bowleg to call his family. After Bowleg made the second, false statement, the agent allowed Bowleg to call his family.

Bowleg testified that he texted Pinke on May 5, 2012, and told her that he would see her "Tomorrow" (May 6, 2012). Bowleg testified that he had lied to Pinke: Bowleg knew that, on May 6, he would be in the United States and Pinke would be in the Bahamas. Bowleg lied to Pinke because they were "having bad times," and she had cheated on him.

8

## II.  PROCEDURAL BACKGROUND

### A.    Indictment

On May 29, 2012, an indictment charged Bowleg with four counts of alien smuggling for financial gain (Counts 1 through 4); one count of conspiracy to allow, procure, and permit an alien convicted of an aggravated felony to enter the United States (Count 5); and one count of aiding and assisting an alien convicted of an aggravated felony to enter the United States (Count 6).

### B.    Motion to Suppress

On July 5, 2012, Bowleg filed a motion to suppress the statements he made to law enforcement after his placement in custody.  Bowleg claimed that Agents Sullivan and Cisneros, who interviewed Bowleg, never advised Bowleg of his Miranda rights.  Although Bowleg signed a form listing and waiving his Miranda rights, Bowleg claimed that it was "questionable" as to whether he understood what he signed and thus he did not waive his rights voluntarily and knowingly. Bowleg also argued that the agents coerced him into making incriminating statements because they told Bowleg that he could not call his family until he made a statement.

On July 20, 2012, following an evidentiary hearing, a magistrate judge issued a report and recommendation ("R&R").  The magistrate judge recommended denying Bowleg's motion to suppress.  The magistrate judge found

9

that (1) Agent Sullivan read Bowleg his <u>Miranda</u> rights and (2) Bowleg understood his rights as Agent Sullivan explained them.  The magistrate judge also determined that, although the agents told Bowleg that he could not call his family until the interview concluded, this was not a coercive procedure.  The magistrate judge concluded that Bowleg had knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights before making a statement.  The magistrate judge's R&R stated that the parties "shall serve and file written objections" to the R&R with the district court within 14 days after being served with a copy.  No party filed objections to the R&R.

On August 7, 2012, the district court reviewed the record <u>de novo</u>, noted that no objections to the R&R were filed, affirmed and adopted the R&R, and denied Bowleg's motion to suppress.

## C.    August 2012 Trial

At trial, the government's witnesses testified about Bowleg's role piloting the boat from the Bahamas to the United States.  After the government rested, Bowleg moved for a judgment of acquittal on all counts of the indictment.  The district court denied the motion as to Counts 1 through 4 and reserved on Counts 5 and 6.

Bowleg's counsel informed the district court that he wished to call Pratt as a witness.  Bowleg's counsel sought to ask Pratt about a handwritten letter that Pratt

purportedly drafted and sent to Bowleg's counsel sometime prior to Bowleg's trial. The letter, dated May 30, 2012, stated: (1) Bowleg was not Pratt's "helper" or "assistant" on the boat; (2) Pratt was the captain; and (3) Bowleg "was only a passenger."

Rather than testify, Pratt invoked his right to remain silent under the Fifth Amendment. Pratt believed that testifying could subject him to a prosecution for perjury or like charges.[6] On June 22, 2012, prior to Bowleg's trial, Pratt pled guilty to one count of smuggling an alien for financial gain, pursuant to a written plea agreement. At his plea colloquy, Pratt affirmed, under oath, the facts set forth in his plea agreement, including the fact that Bowleg and Pratt together had "operated" the boat.[7]

Bowleg moved for a mistrial because Pratt would not testify. The district court denied the mistrial motion because Pratt had validly invoked his Fifth Amendment right to remain silent.[8]

---

[6] If Pratt testified, he would have been immune from prosecution by the U.S. Attorney's Office for the Southern District of Florida for any additional offense arising out of the May 5-6 voyage, with the exception of crimes of violence. Pratt would not have been immune to a prosecution for perjury or like charges.

[7] The district court determined that, based upon its "standard practice," Pratt would have sworn to the truth of the facts in his plea agreement before the district court would have accepted Pratt's plea. A transcript of Pratt's plea hearing was not prepared, however.

[8] Bowleg does not challenge the district court's determination that Pratt validly invoked his Fifth Amendment right to remain silent, and thus, we do not address this issue on appeal.

11

After Bowleg rested, Bowleg renewed his motion for judgment of acquittal. The district court denied the motion as to Counts 1 through 4 and again reserved on Counts 5 and 6.

**D.    Bowleg's Request to Admit Pratt's Statements to Agent Cisneros**

After the government and defense had rested, but before closing arguments, the government notified Bowleg, for the first time, that Agent Cisneros had interviewed Pratt sometime between Pratt's June 22, 2012 guilty plea and Bowleg's August 2012 trial.  During this interview, Pratt informed Agent Cisneros that, although Bowleg, along with other passengers on the boat, "held the wheel for [Pratt] briefly a couple of times," Pratt was the captain of the boat, and Bowleg was a passenger.

Bowleg's counsel requested the district court to allow him to reopen his case and have Pratt testify about the statements made during that interview.  Pratt again invoked his Fifth Amendment right to remain silent based on the possibility that testifying could result in him being charged with perjury.

Bowleg's counsel then requested that the district court allow him to reopen his case and have Agent Cisneros testify about Pratt's statements made at the interview.  Bowleg's counsel claimed that, during the interview, Agent Cisneros likely spoke to Pratt about the May 30 letter and that Agent Cisneros could testify about that letter too.

12

The government objected to the admission of this evidence as inadmissible hearsay.  Bowleg argued that Agent Cisneros's testimony about Pratt's interview statements was admissible under Rule 804(b)(3) of the Federal Rules of Evidence, an exception to the hearsay rule.

The district court sustained the government's hearsay objection.  The court determined that Pratt's interview statements were untrustworthy and thus not admissible under Rule 804(b)(3).  Bowleg again moved for a mistrial because, if Pratt's exculpatory statements were not introduced into evidence, Bowleg could not have a full and fair trial.  The court denied Bowleg's motion for a mistrial.[9]

## E.    Jury Verdict

After deliberations, the jury found Bowleg guilty of four counts of alien smuggling for financial gain (Counts 1 through 4) and one count of aiding and assisting an alien convicted of an aggravated felon to enter the United States (Count 6).  The jury found Bowleg not guilty of conspiracy to allow, procure, and permit an alien convicted of an aggravated felon to enter the United States (Count 5).  The court denied Bowleg's motion for acquittal (upon which the court had reserved ruling) as to Count 6 and adjudicated Bowleg guilty of Counts 1 through 4 and Count 6.

## F.    Presentence Investigation Report

[9]Because of the district court's rulings, Agent Cisneros did not testify about Pratt's statements before the jury.  Pratt also did not testify before the jury.

13

Bowleg's presentence investigation report ("PSI") calculated a total offense level of 32 and a criminal history category of I, yielding an advisory guidelines range of 121 to 151 months' imprisonment.  The total offense level of 32 consisted of: (1) a base offense level of 23 under U.S.S.G. § 2L1.1(a)(2); (2) a 3-level increase for transporting 13 unlawful aliens under § 2L1.1(b)(2)(A); (3) a 2-level increase for smuggling a minor unaccompanied by a parent or grandparent under § 2L1.1(b)(4); (4) a 2-level increase for intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person under § 2L1.1(b)(6); and (5) a 2-level increase for obstruction of justice under U.S.S.G. § 3C1.1.  Although the PSI recommended a 2-level increase for use of a special skill under U.S.S.G. § 3B1.3, that increase was not used to calculate the total offense level of 32.  Therefore, the guidelines calculation did not include a two-level increase for use of a special skill under § 3B1.3.

Counts 1 and 2 had a statutory mandatory minimum sentence of three years and a maximum sentence of ten years.  Counts 3 and 4 had a mandatory minimum sentence of five years and a maximum sentence of fifteen years.[10]  Count 6 had a maximum sentence of ten years.

---

[10]A defendant convicted for the first or second time of smuggling an alien for financial gain must be sentenced to at least three years' imprisonment, but no more than ten years' imprisonment.  8 U.S.C. § 1324(a)(2)(B)(ii).  The statutory sentencing range for subsequent convictions is five to fifteen years' imprisonment.  Id.  Thus, Counts 3 and 4 had increased statutory penalties due to Bowleg's convictions on Counts 1 and 2.

## G.    Bowleg's October 2012 Written Objections to the PSI

In his written objections to the PSI filed in October 2012,[11] Bowleg objected to: (1) the two-level increase for creating a substantial risk of death or serious injury to another; (2) the two-level increase for obstruction of justice; and (3) the absence of a two-level reduction for acceptance of responsibility.

Bowleg also requested that the district court vary downward from the advisory guidelines range based on the 18 U.S.C. § 3553(a) factors and impose a total sentence of 60 months' imprisonment because, inter alia, Bowleg (1) had no prior criminal history; (2) was abused as a child and had a drug addiction; (3) would be deported and thus would not be a threat to society; and (4) was a passenger on the boat, as shown by Bowleg's trial testimony and Pratt's May 30 letter.  Further, a higher sentence would create an unwarranted disparity between Bowleg's and Pratt's sentences, as Pratt received a sentence of only 36 months' imprisonment.

## H.    November 2, 2012 Sentencing Hearing

At the sentencing hearing on November 2, 2012, Bowleg reiterated his written objections to his guidelines calculations and objected to the two-level increase for transporting a minor because Bowleg had no knowledge that the individual was a minor.  He also objected to the district court applying a § 3B1.3

---

[11]The PSI Addendum stated that Bowleg had no objections.  On September 14, 2012, Bowleg received the PSI, and on October 18, 2012, he filed written objections.

increase, despite the fact that his guidelines calculation did not include the § 3B1.3 increase.

The court overruled Bowleg's objections to the guidelines calculations. The district court thus adopted the advisory guidelines range set forth in the PSI, 121 to 151 months' imprisonment. As we have said, the guidelines calculations in the PSI, which the district court adopted, did not include the § 3B1.3 increase.

After considering the § 3553(a) factors and the statements of the parties, the district court sentenced Bowleg to 84 months' imprisonment on each of the five counts of conviction, to run concurrently to each other. The district court stated that Bowleg had perjured himself and abused his right to a trial by jury, and thus, a higher sentence than Pratt's 36-month sentence was warranted. The district court varied downward, however, because of the disparity between Pratt's sentence and Bowleg's advisory guidelines range of 121 to 151 months' imprisonment.

### III.  MOTION TO SUPPRESS

On appeal, Bowleg argues that the district court erred in denying his motion to suppress his May 6, 2012 statements to Agents Sullivan and Cisneros because the statements were coerced and made without him first validly waiving his Miranda rights.

Pursuant to Rule 59(b)(2) of the Federal Rules of Criminal Procedure, a defendant's failure to file specific written objections to a magistrate judge's R&R

16

on a motion to suppress within fourteen days after being served with the R&R, or by some other date set by the court, constitutes a waiver of the defendant's right to appellate review of the district court's adoption of that R&R.  Fed. R. Crim. P. 59(b)(1)-(2); see United States v. Garcia-Sandobal, 703 F.3d 1278, 1282-83 (11th Cir. 2013) (providing that the defendant waived his right to challenge the district court's adoption of the magistrate judge's recommendation that the district court accept the defendant's guilty plea by not filing objections to the magistrate judge's R&R within fourteen days).

Here, Bowleg did not file any objections to the magistrate judge's R&R in the district court.  The district court noted that Bowleg had not filed any objections to the magistrate judge's R&R, affirmed and adopted the R&R, and then denied Bowleg's motion to suppress.  Based on Bowleg's failure to file objections to the R&R, we conclude that Bowleg waived his right to appellate review of the district court's denial of his motion to suppress.

Alternatively, we conclude that the district court did not commit error, plain or otherwise, in denying Bowleg's motion to suppress the statements he made to Agents Cisneros and Sullivan.[12]  An accused effectively waives his Miranda rights if he: (1) voluntarily relinquishes them as the product of a free and deliberate

---

[12]Because rulings on motions to suppress involve mixed questions of fact and law, this Court ordinarily reviews the district court's factual findings for clear error, and its application of the law to the facts de novo.  See United States v. Lewis, 674 F.3d 1298, 1302 (11th Cir. 2012). This Court, however, reviews arguments not properly preserved in the district court for plain error.  See United States v. Young, 350 F.3d 1302, 1305 (11th Cir. 2003).

17

choice, rather than through intimidation, coercion or deception; and (2) made his decision with the full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." Id. (quotation marks omitted).

At the motion to suppress hearing, Agent Cisneros testified that Bowleg was fully advised of his Miranda rights orally, in English (Bowleg's native language), confirmed that he understood those rights, and then signed a paper waiving those rights. The magistrate judge—the factfinder—disbelieved Bowleg's testimony that the agents never read Bowleg his Miranda rights aloud, and we defer to the magistrate judge's credibility finding. See United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012) ("[W]e afford substantial deference to the factfinder's credibility determinations, both explicit and implicit."). Thus, Bowleg's argument that he was prevented from understanding his Miranda rights due to his limited reading comprehension lacks merit.

Further, the agents' actions in not permitting Bowleg to use the phone until he gave a statement were not coercive. See United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) ("Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of

18

physical force or the threat to do so, or the making of a promise that induces a confession." (quotation marks omitted)).  And, an agent is permitted to discuss the potential penalties for alien-smuggling with a defendant during an interview, such that the voluntariness of Bowleg's subsequent statements was not affected by the agents telling Bowleg that he could receive five years' imprisonment for alien smuggling.  See United States v. Nash, 910 F.2d 749, 753 (11th Cir. 1990) ("[T]elling the defendant in a noncoercive manner of the realistically expected penalties and encouraging him to tell the truth is no more than affording him the chance to make an informed decision with respect to his cooperation with the government." (quotation marks omitted and alterations adopted)).   In sum, the district court did not commit error, let alone plain error, in concluding that Bowleg voluntarily, knowingly, and intelligently waived his Miranda rights.

## IV. SUFFICIENCY OF THE EVIDENCE[13]

Bowleg challenges the sufficiency of the evidence supporting his convictions for smuggling an alien for financial gain (Counts 1 through 4) and

---

[13]"We review challenges to the sufficiency of the evidence in criminal cases de novo, viewing the evidence in the light most favorable to the government." United States v. Dominguez, 661 F.3d 1051, 1061 (11th Cir. 2011).  "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. (quotation marks and brackets omitted). "We assume that the jury made all credibility choices in support of the verdict and accept all reasonable inferences that tend to support the government's case." Id. (quotation marks omitted).  This Court reviews the denial of a motion for a judgment of acquittal de novo, applying the same standard used in reviewing the sufficiency of the evidence. United States v. Descent, 292 F.3d 703, 706 (11th Cir. 2002).

aiding and assisting an alien convicted of an aggravated felony enter the United States (Count 6).

## A.    Smuggling an Alien for Financial Gain

To sustain a conviction of smuggling an alien for financial gain, the government must prove beyond a reasonable doubt that the defendant: (1) knowingly brought an alien into the United States; (2) knew or recklessly disregarded the fact that the alien had not received prior official authorization to come to or enter the United States; and (3) participated in the smuggling for private financial gain. United States v. Dominguez, 661 F.3d 1051, 1063-64, 1066 (11th Cir. 2011); see 8 U.S.C. § 1324(a)(2)(B)(ii). "To act with 'reckless disregard' means to be aware of, but consciously and carelessly ignore, facts and circumstances clearly indicating that the person transported [had not received prior official authorization to come to or enter the United States]." See United States v. Perez, 443 F.3d 772, 781 (11th Cir. 2006) (emphasis omitted) (defining "reckless" disregard for the purposes of 8 U.S.C. § 1324(a)(1)(A)(ii), proscribing unlawfully transporting illegal aliens).

We conclude that the evidence was more than sufficient to sustain Bowleg's four convictions (Counts 1 through 4) for smuggling an alien for financial gain. First, the trial testimony, viewed in the light most favorable to the government, showed that Bowleg knowingly brought thirteen aliens into the United States.

20

Specifically, the evidence showed that Bowleg (1) was on the boat with Pratt at the time it picked up the thirteen aliens from the beach; (2) operated the boat with Pratt's assistance; (3) navigated the boat towards its destination, West Palm Beach, Florida, using a GPS-device; (4) monitored the waters and sky with binoculars; (5) refueled the boat when it ran out of gasoline; (6) received text messages from Chris, an organizer of the smuggling offense, telling Bowleg to "check the sky"; (7) told Pinke, Bowleg's girlfriend, that Bowleg would see her "tomorrow," suggesting that he was not a passenger on the boat, as he planned to return to the Bahamas on May 6 and not remain in the United States like the thirteen passenger aliens; and (8) gave inconsistent statements to agents, stating both that Chris paid Bowleg to assist Pratt in transporting a group of aliens to the United States and that Bowleg paid Chris for transportation to the United States.

Further, at trial, Bowleg admitted that he knew that all of the aliens lacked authorization to enter the United States because they otherwise would not have traveled on the motorboat, but would have arranged different transportation. And, the trial testimony also showed that four of the thirteen aliens on the boat each paid $3,000 to $7,000 for transportation to the United States and that Bowleg had $1,000 in U.S. currency in his inventoried possessions. In one of Bowleg's statements to agents, he admitted that Chris paid him $1,000 to transport the aliens

21

to the United States.  Based on this evidence, we conclude that a reasonable jury could find that Bowleg participated in alien smuggling for financial gain.

Bowleg points to his testimony at trial as evidence of his innocence.  The jury was entitled to disbelieve Bowleg's testimony and believe that the opposite of what Bowleg said was true.  United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (providing that "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt" because a jury, after hearing a defendant's "words and seeing his demeanor, was entitled to disbelieve [the defendant's] testimony and, in fact, to believe the opposite of what [the defendant] said").  Even if Bowleg's testimony is not substantive evidence of his guilt, his statement merely contradicted the government's evidence, and the credibility of the witnesses was an issue for the jury to decide.  And, there was ample evidence of guilt from the government's witnesses alone.

## B.    Aiding or Assisting an Alien Convicted of an Aggravated Felony Enter the United States

To sustain a conviction of aiding or assisting an alien convicted of an aggravated felony enter the United States, the government must prove beyond a reasonable doubt that the defendant: (1) "knowingly aid[ed] or assist[ed]" an alien enter the United States; (2) knew that the alien was inadmissible; and (3) the alien was inadmissible under 8 U.S.C. § 1182(a)(2), for having been convicted of an aggravated felony.  8 U.S.C. § 1327; see United States v. Lopez, 590 F.3d 1238,

22

1254 (11th Cir. 2009).  Importantly, the government must prove only that the defendant knew that the alien was inadmissible, not that the alien was inadmissible under § 1182(a)(2) for having been convicted of an aggravated felony.  See Lopez, 590 F.3d at 1254 ("We first conclude that the district court properly instructed the jury that § 1327 did not require [the defendant] to know that the alien on board had a prior felony conviction but only that the alien he aided or assisted in entering the United States was inadmissible.").

Undocumented aliens are inadmissible under 8 U.S.C. § 1182(a)(7).  Section 1182(a)(7) provides that an immigrant who "is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document . . . is inadmissible."  8 U.S.C. § 1182(a)(7)(A)(i)(I).

We conclude that the evidence was sufficient to sustain Bowleg's conviction for aiding and assisting an alien convicted of an aggravated felony enter the United States (Count 6).  One of the aliens on board the boat was Richard Manuel Encarnacion-Perez who had been convicted of conspiracy to possess 50 kilograms of cocaine with intent to distribute and armed robbery.  Based on Bowleg's role in piloting the boat, discussed above, we have little difficulty concluding that a reasonable jury could have found that Bowleg "knowingly aid[ed] or assist[ed]" Encarnacion-Perez enter the United States.  And, Encarnacion-Perez's convictions made him inadmissible under § 1182(a)(2), for having been convicted of an

23

aggravated felony.  Although the evidence does not show that Bowleg knew that Encarnacion-Perez was an aggravated felon, such knowledge is not required for us to sustain Bowleg's conviction on Count 6.  Rather, all that is needed is evidence that Bowleg knew that Encarnacion-Perez was inadmissible to the United States.  As noted above, Bowleg admitted at trial that all of the aliens on the boat, including Encarnacion-Perez, lacked documentation to allow them entry into the United States.  Thus, the evidence is sufficient to show that Bowleg had knowledge of the facts that showed that Encarnacion-Perez was inadmissible under § 1181(a)(7).

Bowleg also argues that the evidence was insufficient as to Count 6 because his acquittal on Count 5, for conspiracy to allow, procure, and permit an alien convicted of an aggravated felony to enter the United States, was inconsistent with the jury's finding of guilty on Count 6.  We have stated, however, that "aiding [and] abetting . . . are not terms that presuppose the existence of an agreement.  Those terms have a broader application, making the defendant a principal when he consciously shares in the criminal act, regardless of the existence of a conspiracy."  United States v. Nelson, 599 F.2d 714, 719 (5th Cir. 1979).  Even assuming, arguendo, that the verdicts were inconsistent.  Nevertheless, we reject Bowleg's argument because a guilty verdict must stand if it is supported by sufficient evidence, even where there is an inconsistent verdict on another count.  See United

24

States v. Mitchell, 146 F.3d 1338, 1344-45 (11th Cir. 1998) (stating that jury

verdicts are "insulated from review" on the ground that they are inconsistent).

## IV.  FAIR TRIAL

Bowleg argues that the district court erred in denying his request to reopen

his case and have Agent Cisneros testify about Pratt's statements, made during a

post-guilty-plea interview.  During the interview, Pratt told Agent Cisneros that,

although Bowleg "had held the wheel for [Pratt] briefly," Pratt was the captain of

the boat and Bowleg was a passenger.  Bowleg argues that Agent Cisneros's

testimony about Pratt's statements was admissible under Rule 804(b)(3) of the

Federal Rules of Evidence.

Hearsay is defined as a statement that "(1) the declarant does not make while

testifying at the current trial or hearing; and (2) a party offers in evidence to prove

the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  "Hearsay

is inadmissible unless the statement is not hearsay as provided by Rule 801(d) [of

the Federal Rules of Evidence] or falls into one of the hearsay exceptions."  United

States v. Caraballo, 595 F.3d 1214, 1226 (11th Cir. 2010) (quotation marks

omitted).

A hearsay statement against the declarant's penal interest is admissible

under Rule 804(b)(3), an exception to the hearsay rules, if (1) the declarant is

unavailable; (2) the statement has so great a tendency to expose the declarant to

criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement is corroborated by circumstances clearly indicating its trustworthiness.[14]  Fed. R. Evid. 804(b)(3) (amended 2010); see United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1208 (11th Cir. 2009).  "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."  U.S. Infrastructure, Inc., 576 F.3d at 1208 (quotation marks omitted).

Here, at issue is only the third prong of the Rule 804(b)(3) test: whether Pratt's unsworn statements were trustworthy.  To determine trustworthiness, the district court should decide "what the possibility was that the declarant fabricated the statement."  See United States v. Jernigan, 341 F.3d 1273, 1288 (11th Cir. 2003) (quotation marks omitted).  A statement is trustworthy where "it [is] unlikely, judging from the circumstances, that the statement was fabricated."  Id. (quotation marks omitted).

As to the third requirement, Bowleg raises the same argument that he did in the district court: that Pratt's statements were trustworthy because they were

---

[14]While a determination of whether a statement is against the declarant's penal interest is purely a question of law subject to de novo review, consideration of a statement's trustworthiness requires a review of findings of fact for clear error and a review of the trial court's application of a legal standard to the facts.  United States v. Westry, 524 F.3d 1198, 1214-15 (11th Cir. 2008).

corroborated by Bowleg's testimony—that he was only a passenger—and Encarnacion-Perez's testimony—that, although Bowleg and Pratt refueled the motorboat, other aliens assisted in refueling the motorboat too. After considering Bowleg's argument, the district court found that Pratt's unsworn statements were not trustworthy because they were inconsistent with Pratt's sworn statements in his plea agreement—providing that Bowleg and Pratt together "operated" the motorboat. On appeal, Bowleg does not dispute that Pratt's unsworn statements were inconsistent with the sworn statements in his plea agreement. Both Bowleg and Pratt each had $1,000 in cash on their person in the same $100 denominations. Other witnesses testified that Bowleg was a pilot who operated and navigated the boat. In light of the district court's finding about the inconsistency between Pratt's statements and the other evidence and testimony at trial, Pratt's statements were likely fabricated. We conclude that the district court did not clearly err in finding that Pratt's hearsay statements were untrustworthy.

Additionally, we conclude that the exclusion of Pratt's statements from evidence did not violate Bowleg's due process right to a fair trial because the statements were untrustworthy. See Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973) (recognizing that a technical application of the exclusionary hearsay rules may contribute to denial of justice if the excluded evidence "bore persuasive assurances of trustworthiness" and was "critical" to the

27

defendant's case); see United States v. Pena, 527 F.2d 1356, 1362 (5th Cir. 1976) (concluding that defendant's due process right to a fair trial was not violated because there was "not sufficient assurance that the excluded testimony was reliable").

Alternatively, any error in excluding Pratt's unsworn statements is harmless because the statements' exclusion does not affect Bowleg's substantial rights. See Fed. R. Crim. P. 52(a). This is because Pratt's unsworn statements provided only that (1) Pratt was the "captain" of the boat; (2) Bowleg was a "passenger"; and (3) Bowleg "had held the wheel for [Pratt] briefly." These statements were conclusory and did not refute the overwhelming evidence presented at trial, showing Bowleg's guilt.

## V.    GUIDELINES CALCULATIONS[15]

As an initial matter, we note that, on appeal, Bowleg originally argued that the district court erred in applying a § 3B1.3 increase. However, because the § 3B1.3 increase was not included in the guidelines calculation adopted by the district court, Bowleg has since conceded that this issue is moot. We do not discuss this issue further below.

## A.    Substantial Risk of Harm, U.S.S.G. § 2L1.1(b)(6)

---

[15]With respect to sentencing guidelines issues, this Court reviews legal questions de novo and factual findings for clear error. United States v. Johnson, 694 F.3d 1192, 1195 (11th Cir. 2012). However, where a defendant fails to raise an argument before the district court, this Court reviews for plain error. Id.

28

A two-level increase to a defendant's offense level applies where an alien smuggling offense "involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." U.S.S.G. § 2L1.1(b)(6). Reckless conduct under this subsection "includes a wide variety of conduct (e.g., . . . carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition)." Id. § 2L1.1, cmt. n.5.

In United States v. Rodriguez-Lopez, this Court upheld the application of an offense level increase under § 2L1.1(b)(5) (now § 2L1.1(b)(6)) when the defendant's small boat transported twenty-two passengers at high speeds and with an insufficient number of life jackets, equating such a risk with transporting aliens in vehicles without enough seatbelts. 363 F.3d 1134, 1137-38 (11th Cir. 2004). Similarly, this Court upheld the application of the increase when the defendant's boat carried eleven people from the Bahamas to Florida on a twenty-five-foot long fishing boat with only three life jackets, in part, because of the likely death or serious injury that would have resulted if the boat capsized. Caraballo, 595 F.3d at 1230-31.

According to the uncontested facts in the PSI,[16] Bowleg transported fifteen people on a twenty-two-foot long motorboat designed to carry eleven. The voyage lasted multiple hours on the open water, as the motorboat traveled from the Bahamas to West Palm Beach, Florida. The boat was equipped with enough life jackets for about half of the people on board, as it carried eight life jackets for its fifteen passengers, creating a risk of drowning in the case of capsize or other emergency on the open ocean. See id. Further, at the time the U.S. Coast Guard intercepted the motorboat, it was traveling without lights and beginning to take on water, indicating that the risk of death or seriously bodily injury was far from hypothetical. Based on these facts, the district court did not clearly err in finding that Bowleg had recklessly created a substantial risk of death or serious injury to those passengers on board the motorboat. Rodriguez-Lopez, 363 F.3d at 1137-38; Caraballo, 595 F.3d at 1230-31. Accordingly, we affirm the district court's application of the two-level increase for intent to create a substantial risk of death or serious injury.

## B.    Transportation of an Unaccompanied Minor, U.S.S.G. § 2L1.1(b)(4)

A two-level increase applies to a defendant's offense level where a defendant smuggled, transported, or harbored a minor who was unaccompanied by his parent or grandparent. U.S.S.G. § 2L1.1(b)(4). Bowleg did not dispute the

---

[16]A defendant's failure to object to allegations of fact in the PSI admits those facts for sentencing purposes. United States v. Beckles, 565 F.3d 832, 844 (11th Cir. 2009).

30

PSI's allegations that one of the passengers on the motorboat was (1) fifteen years' old and (2) not accompanied by a parent or grandparent, and thus, Bowleg admitted these facts for sentencing purposes. See Beckles, 565 F.3d at 844. Based on these undisputed facts, we conclude that the district court did not err in applying the two-level increase under § 2L1.1(b)(4).

## C.     Obstruction of Justice, U.S.S.G. § 3C1.1

A two-level increase for obstruction of justice applies to a defendant's offense level if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The commission of perjury under oath on material matters, not due to confusion, mistake, or faulty memory, is grounds for an obstruction increase. United States v. Dunnigan, 507 U.S. 87, 94, 96, 113 S. Ct. 1111, 1117 (1993) (providing that, while a defendant has a right to testify on his own behalf, the Supreme Court has made it abundantly clear that "a defendant's right to testify does not include a right to commit perjury"); U.S.S.G. § 3C1.1, cmt. n.4(B). To apply the increase, "[t]he district court must make an independent factual finding that the defendant gave perjured testimony on a material matter." United States v. Vallejo, 297 F.3d 1154, 1168 (11th Cir. 2002).

The district court applied a two-level increase for obstruction of justice because Bowleg falsely testified that he was only a passenger on the motorboat.[17] The overwhelming evidence at trial showed that Bowleg assisted in operating and navigating the boat and was not merely a passenger.  Bowleg has failed to show that the district court erred in finding that he committed perjury and applying a two-level increase for obstruction of justice.

## D.    Acceptance of Responsibility, U.S.S.G. § 3E1.1

A defendant may receive a two-level reduction in his offense level "[i]f the defendant clearly demonstrates acceptance of responsibility."  U.S.S.G. § 3E1.1(a). A defendant who proceeds to trial is not automatically precluded from consideration of a reduction for acceptance of responsibility.  Id., cmt. n.2 (providing that, in "rare" cases, such as where a defendant goes to trial to assert a preserve issues that do not relate to factual guilt, a reduction may be appropriate). However, this adjustment is not intended to apply to a defendant "who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  Id.; see United States v. Gonzalez, 70 F.3d 1236, 1239-40 (11th Cir. 1995) (concluding that the district court did not clearly err in denying the application of a reduction

---

[17]The district court also found that the obstruction-of-justice increase applied because Bowleg had falsely testified about the texts he sent to Pinke and about why he gave different statements to agents.  We need not address whether the increase applied based on this testimony, in light of the court's other basis for the increase's application.

32

for acceptance of responsibility where the defendant challenged the admissibility of evidence and put the government to its burden of proof by going to trial).

Here, in light of Bowleg's refusal to admit his factual guilt throughout trial and, indeed, continued assertion of his innocence at sentencing, we conclude that the district court did not clearly err in denying the application of a two-level reduction for acceptance of responsibility.[18]

## VI.  REASONABLENESS OF SENTENCE

We review the reasonableness of a sentence under a deferential abuse of discretion standard.  Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).  We first determine whether the district court committed any significant procedural error and then examine whether the sentence is substantively unreasonable under the totality of the circumstances.  United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).  The abuse of discretion standard "'allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'"  United States v. Irey, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (internal quotation marks omitted).  We ordinarily expect a sentence within the advisory guidelines range to be reasonable.  United States v.

---

[18]We reject Bowleg's argument that his Fifth and Sixth Amendment rights were violated because the district court calculated his offense level based on facts that were neither pled in the indictment nor proven to a jury.  A district court may properly increase a defendant's sentence under the Guidelines so long as it applies the Guidelines in an advisory fashion, as the district court did here.  See United States v. McGarity, 669 F.3d 1218, 1257 (11th Cir. 2012), cert. denied, 133 S. Ct. 378 (2012); United States v. Thomas, 446 F.3d 1348, 1355 (11th Cir. 2006).

Talley, 431 F.3d 784, 788 (11th Cir. 2005).  The party challenging the sentence bears the burden of proving the sentence is unreasonable in light of the record and the § 3553(a) factors.  Id.[19]

Because we conclude that the district court properly calculated the advisory guidelines range, we do not address Bowleg's argument that his sentence is procedurally unreasonable based on a guidelines calculation error.  As to substantive unreasonableness, Bowleg argues that his 84-month total sentence is disparate as compared with the 36-month sentence Pratt received.  In considering the § 3553(a) factors, the district court should avoid unwarranted sentence disparities among defendants with "similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  For a substantive-unreasonableness claim based on a sentencing disparity, we require that the defendant raising the claim be similarly situated to those who received lesser sentences.  United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009).

Here, Bowleg has not shown that he is similarly situated to Pratt for sentencing purposes.  See id.  Pratt cooperated with the government, pleading

---

[19]The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.  18 U.S.C. § 3553(a).

guilty, pursuant to a written plea agreement, to only one count of smuggling an alien for financial gain, whereas Bowleg did not plead guilty, but proceeded to trial and was ultimately convicted of four counts of smuggling an alien for financial gain and one count of aiding and assisting an alien convicted of an aggravated felony enter the United States.  Id. (providing that "defendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant who provides no assistance to the government and proceeds to trial" and there "is no unwarranted disparity even when the sentence the cooperating defendant receives is 'substantially shorter'").  Bowleg also received a two-level increase for obstruction of justice due to his perjury during his trial.  Because Bowleg has not shown that he is similarly situated to Pratt, he has not shown that his sentence is substantively unreasonable in this respect.

We also conclude that Bowleg has not shown that the district court committed a clear error of judgment in imposing a total sentence of 84 months' imprisonment.  See Irey, 612 F.3d at 1189.  His 84-month sentence was a 37-month downward variance from the low-end of the advisory guidelines range of 121 to 151 months' imprisonment.  The district court was entitled to conclude that a downward variance of 61 months, to a sentence of 60 months' imprisonment, was not warranted, in light of the seriousness of Bowleg's offenses, and Bowleg's perjury during his trial.  Further, Bowleg's sentence of 84 months was well below

35

the statutory maximums of 120 months for Counts 1, 2, and 6 and the statutory maximum of 180 months' imprisonment for Counts 3 and 4, which is one indicator of a reasonable sentence.  See United States v. Gonzalez, 550 F.3d 1319, 1324 (11th Cir. 2008) (considering a sentence below the statutory maximum as an indicator of reasonableness); 8 U.S.C. §§ 1324(a)(2)(B)(ii); 1327.  Under the totality of the circumstances, we cannot say that Bowleg's total sentence of 84 months' imprisonment was an abuse of discretion.

## VII.  CONCLUSION

For all the foregoing reasons, we affirm Bowleg's convictions and sentences.

**AFFIRMED.**